IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JEFFREY L. SENCINDIVER,

        Plaintiff,

        v.                              Civil Action No. 3:08-CV-178

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.      Background

      Plaintiff, Jeffrey Sencindiver (Claimant), filed a Complaint on December 8, 2008,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

17, 2009.[2]  Claimant filed her Motion for Summary Judgment on December 7, 2009.[3]

Commissioner filed his Motion for Summary Judgment on January 5, 2010.[4]

B.      The Pleadings

      1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 14.

[4] Docket No. 15.

1

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.  <u>Recommendation</u>

I recommend that:

1.  Claimant's Motion for Summary Judgment be **DENIED** because 1) substantial evidence supports the ALJ's finding that Claimant was not entirely credible, 2) the ALJ did not err by concluding that Claimant did not suffer from a severe mental impairment prior to the date last insured, and 3) the ALJ adequately accounted for all of Claimant's limitations in the RFC.

2.  Commissioner's Motion for Summary Judgment be **DENIED** for the same reason set forth above.

## II.  Facts

A.  <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) on January 23, 2006, alleging disability since February 10, 1999, due to vertigo; memory loss; neck, head, and lower back pain; diabetes; numbness in left arm and hand; pain in teeth; ringing in ears; left hip pain; concentration problems; and carpal tunnel disease. (Tr. 85).  The claim was denied initially on April 18, 2006, (Tr. 51) and upon reconsideration on October 11, 2007.  (Tr. 56).  Claimant filed a written request for a hearing on December 11, 2006.  (Tr. 61).  Claimant's request was granted and a hearing was held on November 8, 2007. (Tr. 462-71) and a supplemental hearing held on March6, 2008.  (Tr. 472-544).

The ALJ issued an unfavorable decision on April 23, 2008.  (Tr. 10-25).  The ALJ determined Claimant was not disabled under the Act because there were jobs that existed in

significant numbers in the national economy that Claimant could have performed under 20 C.F.R. 404.1560(c) and 404.1566. (Tr. 24). Claimant filed a request for review of that determination. (Tr. 9). The request for review was denied by the Appeals Council on October 3, 2008. (Tr. 6). Therefore, on October 3, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.      Personal History

Claimant was born on February 20, 1962, and was thirty-eight (38) years old as of the onset date of his alleged disability and forty-six (46) as of the date of the ALJ's decision. (Tr. 119). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations at the time of her onset date and at the time of the ALJ's decision. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant graduated from high school and has vocational training as an automobile mechanic. (Tr. 497-98). Claim has past relevant work experience as a hardware and plumbing salesperson, a plumber, a tour bus agent, a vending machine attendant, and a warehouse worker. (Tr. 499, 501-09).

C.      Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Initial Inquiry, Dr. Bland, Ear, Nose & Throat Associates, 2/16/99 (Tr. 260)**
examination: ears - normal; oral cavity - clear; nasopharynx - clear

diagnosis: non-displaced nasal bone tip fracture; no further treatment for this is needed facetious

**Letter from Dr. Voelker, 6/7/99 (Tr. 261-62)**
- cervical MRI scan showed a probable left C6-7 disc with additional disc bulges on left at C5-6 and C7-1.
- plain spine films were unremarkable
- recommend physical therapy along with nonsteroidal, anti-inflammatory medications

**West Virginia University Hospital, Department of Emergency Medicine, 4/30/99 (Tr. 165-68)**
- chief complaint: neck pain
- impression: suspect cervical disc disease
- plan: refer for PT

**Physical Therapy Notes, Physical Therapy Services of Fairmont, Inc. 6/9/99 - 1/26/00 (Tr. 264-96)**
6/9/99
- present complaint: pain base of neck and left shoulder; altered sensation on left forearm and hand
6/11/99
- subjective: same amount of neck pain
6/14/99
- subjective: neck pain is same; pain in low back radiating down the left leg
6/16/99
- subjective: increased pain following mechanical treatment; severe pain and headache yesterday
6/18/99
- subjective: pain about the same
6/21/99
- subjective: no new complaints
- assessment: isometric exercises still increase neck pain if too much resistance is applied
6/25/99
- complaints: numbness (parasthesias) in the left anterior thigh and pain in low back; no change in parasthesias of the left forearm
6/28/99
- subjective: pain is the same
6/30/99
- subjective: patient is about the same
7/2/99
- subjective: patient is about the same
7/9/99
- subjective: myelogram revealed "slipped disc" at C6-7
7/12/99
- subjective: no new c/o; very guarded
7/14/99

- subjective: no ill effects from increased exercise; stated he felt looser
7/16/99
- subjective: neck mms were much looser
7/19/99
- subjective: no new complaints
7/21/99
- subjective: no new complaints; reported no ill effects from e-stim last visit
7/23/99
- subjective: about the same
7/26/99
- subjective: no new complaints
7/28/99
- subjective: no new complaints
7/30/99
- subjective: no new complaints
8/2/99
- subjective: no new complaints
8/4/99
- subjective: having surgery for fusion of C6-C7
9/20/99
- present complaint: decreased LE strength; inability to move c-spine; general weakness; still has same numbness in left thigh; numbness in left arm is gone
- plan: progress exercise for conditioning and strengthening
9/22/99
- subjective: patient feels good
9/24/99
- subjective: no complaints
9/27/99
- subjective: no complaints
9/29/99
- subjective: has experienced some pain in left forearm; denies any numbness
10/1/99
- subjective: patient getting some pain in left trap and levator scapula region - occurs with exertion on muscle
10/4/99
- subjective: no change
10/6/99
- subjective: numbness gone but weak in left arm
10/8/99
- subjective: left arm still feels weak
10/11/99
- subjective: complains of dizziness, especially when first sits up; still has pain in left traps
10/13/99
- subjective: cervical pain at about C7; pain in left trap

10/15/99
- subjective: complains of dizziness when lays down; going to try to get referred to ENT at WVU
10/18/99
- subjective: still having left arm pain and left cervical/ trap pain
10/20/99
- subjective: still has dizziness
10/22/99
- subjective: still has dizziness and left arm discomfort
10/25/99
- subjective: same
10/26/99
- subjective: continues to have muscle spasms in left trap
10/27/99
- subjective: left arm had sharp pain
11/1/99
- subjective: had insulin reaction early in week, so is sore
11/3/99
- subjective: not wearing brace; some rotation causes sharp pain down back
11/5/99
- subjective: a little better
11/8/99
- subjective: discouraged but is improving
11/10/99
- subjective: no change
11/12/99
- subjective: no new complaints; right shoulder still sore; has not heard about ENT appointment
11/15/99
- subjective: no new complaints
11/17/99
- subjective: no new complaints
11/19/99
- subjective: feeling better
11/22/99
- subjective: still very dizzy
11/24/99
- subjective: still dizzy; has had no results getting to ENT
12/2/99
- subjective: still dizzy
12/3/99
- subjective: new no complaints
12/8/99
- subjective: no new complaints
12/10/99
- subjective: no new complaints; if didn't have dizziness, would be ready to resume normal

activities

<u>12/13/99</u>
- subjective: no new complaints

<u>12/15/99</u>
- subjective: no new complaints

<u>12/16/99</u>
- subjective: no new complaints

<u>12/20/99</u>
- subjective: no new complaints

<u>12/22/99</u>
- subjective: complains of headache and sharp pain in back of head on right

<u>12/23/99</u>
- subjective: no complaints

<u>12/27/99</u>
- subjective: no complaints

<u>12/29/99</u>
- subjective: no change

<u>1/5/00</u>
- subjective: patient went to (illegible); no conclusions or CT scans

<u>1/7/00</u>
- subjective: no new complaints

<u>1/10/00</u>
- subjective: ENT suggested therapy for nose for blockage

<u>1/12/00</u>
- subjective: no change

<u>1/14/00</u>
- subjective: patient starting to have some visual problems

<u>1/17/00</u>
- subjective: no change in condition; back to ENT

<u>1/19/00</u>
- subjective: no change

<u>1/21/00</u>
- subjective: no change

<u>1/24/00</u>
- subjective: no change
- patient is rehabilitated from cervical surgery.  Dizziness, head pain, and visual disturbances need to be more thoroughly evaluated.  Has been to ENT.  Has never had MRI or CT-scan of head to rule out brain damage.  He is getting worse with this and this is what is limiting his return to normal activities.

<u>1/26/00</u>
- subjective: no new complaints

<u>2/21/00</u>
- needs to be further evaluated to assess for brain damage

<u>4/5/00</u>

- will continue until something is done about his headaches and vertigo. Needs further diagnosis.

<u>6/21/00</u>
- continues to need evaluated by neurologist or neuropsychiatrist


**Surgery Records, WVU Hospitals, Department of Neurosurgery, 7/7/99 - 8/8/99 (Tr. 169-85)**
<u>Surgical Pathology Report</u>
- final diagnosis: cervical intervertebral disc, excision: intervertebral disc tissues
<u>Post-op records</u>
- indication: diskectomy, C6-C7; radiopaque marker identified at C6-C7 vertebral disk interspace anteriorly. Adequate alignment of cervical spine
- indication: straightening and slight reversal of normal cervical lordosis; normal alignment at C6-C7 vertebral levels; disk interspace of C6-C7 appears slightly widened; some slight prominence of prevertebral soft tissues at C6-C7
- indication: single AP projection of pelvis reveals no definite evidence for acute fracture bifida ccculta at S1
<u>Operation Summary</u>
- preoperative diagnosis: left-sided C6-C7 herniated nucleus pulposus with left C7 radiculopathy
- postoperative diagnosis: left-sided C6-C7 herniated nucleus pulposus with left C7 radiculopathy
- intraoperative findings: small herniated fragment posterior to the posterior longitudinal ligament
<u>Discharge Summary</u>
- discharge diagnosis: C6-7 herniated nucleus pulposus
<u>Treatment Records</u>
- impressions:
> - left C6-C7 paramedian disk herniation which encroaches on the left neural foramina and impresses on the ventral thecal SAC
> - minimal degenerative changes seen at C3-C4, C4-C5, and C5-C6 with end-plate osteo
> - small ventral extradural contour defect at L2-L3 otherwise unremarkable lumbar CT focal disk bulge or herniation
> - very small nonfocal ventral extradural contour defect at L2-L3; however, there are no defects. No nerve root sleeve attenuation seen
> - truncation defect with attenuation of contrast column at left C6-C7 exiting nerve root
> - bilateral nerve root sleeve diverticula at C6, C7 and T1


**Letter from Dr. Voelker, 8/10/99 (Tr. 263)**
- left C6-7 herniation
- underwent C6-7 anterior cervical discectomy with iliac crest autograft fusion


**CR: Cervical Spine AP & Lateral, Dr. Voelker, 10/28/99 (Tr. 223)**
- indication: C6-C7 ACDF

- impression: status post anterior cervical discectomy with fusion at C6-C7 without interval change

**Medical Records, Dr. Stearns, Stearns Family Health Center, 12/2/99 - 6/22/00 (Tr. 297-306)**
12/2/99
- subjective: lately not having trouble with diabetes - under fairly good control; ringing in ears; sensation of turning; sleeps well
- assessment/ plan: diabetes under fairly good control; still suffering from dizziness, forgetfulness, and other head and neck complaints; start physical therapy
2/3/00
- subjective:  no new complaints; no real change in dizziness, neck pain, ringing in ears, or muscle weakness and back pain; lightheaded; frequent headaches; lots of neck and back pain
- assessment/ plan: continue to take diabetic vitamins; probably suffering from post-concussive syndrome
2/22/00
- subjective: injured shoulder during insulin accident; no chest pains or shortness of breath; no tingling in hands
- assessment/ plan: probably has a rotator cuff tear; refuses an insulin shot even though his blood sugar was 400 today
2/28/00
- saw Dr. Kirth - piece of bone missing and was dislocated toward back; relocated shoulder
3/16/00
- subjective: continues to have problems with brain fog, dizziness, irritability, and headaches; has sharp, stabbing pains in back of head; diabetes is usually under fairly good control, but he does have insulin reactions
assessment/ plan: continue physical therapy
4/18/00
- subjective: shoulder pain; neck pain
- assessment/ plan: continue insulin
6/22/00
- subjective: sleeps well but doesn't always feel rested; tires easily; no other problems or complaints; sugar is fairly easy to control
- assessment/ plan: diabetes is not under very good control because he has been stressed

**WVU Dept. of Otolaryngology, Dr. Garnett, 12/30/99 (Tr. 220-22)**
- physical exam: conscious, alert, and oriented
- assessment: post-traumatic dizziness and finnitus; possible sleep apnea; history of allergic rhinitis

**History and Physical, Dr. Wetmore, University Health Associates, Department of Otolaryngology, 12/30/99 (Tr. 385-87)**
- physical exam: conscious, alert, and oriented; tympanic membranes normal and mobile bilaterally; deviated septum to left with hypertrophic turbinates on both sides with some mucosal

congestion
- assessment: post-traumatic dizziness and tinnitus; possible sleep apnea; history of allergic rhinitis

**Independent Medical Examination, Dr. Lynch, Professional Medical Rehabilitation, Inc., 1/3/00 (Tr. 307-10)**
- chief complaint: cervical strain
- physical exam: alert, no acute distress; neck is supple; cranial nerves intact
- impression/plan: facial contusion; left frontal teeth injury; cervical strain with diagnosis of C6-7 herniated disk requiring anterior cervical diskectomy; possible post traumatic vertigo; not at maximum degree of medical improvement; will be at maximum degree of medical improvement in next two months; neck pain and headaches are related to cervical injury and are at a maximum degree of improvement; zero percent permanent impairment for this injury

**Independent Medical Examination, Dr. Lynch, Professional Medical Rehabilitation, Inc., 4/7/00 (Tr. 311-13)**
- chief complaint: cervical strain
- physical exam: alert and oriented; no acute distress; neck is supple; no focal areas of tenderness; cranial nerves intact
- impression: dizzy episodes; intermittent left temporal headaches and now reported short-term memory lapse; appears to have symptoms of post concussion syndrome
- plan: recommend evaluation by Dr. Semidei; MRI of brain; not at maximum degree of medical improvement

**MRI Records, 5/12/00 (Tr. 218-19)**
- impressions: paranasal sinus inflammatory disease; essentially unremarkable intracranial findings with a very non-specific focus of increased signal intensity
- no radiopaque foreign bodies are evidence in nor about the orbits

**Independent Medical Examination, Dr. Zyznewsky, Valley Professional Center, 7/20/00 (Tr. 314-15)**
- exam: awake, alert, oriented; seems to have mild memory deficit and difficulty keeping his train of though; cranial nerves were unremarkable; no nystagmus; fundoscopic exam normal; visual fields intact
- assessment: has not reached maximum medical improvement in view of vertigo

**Neuropsychological Evaluation, Dr. Crabtree, Medical Consultants Network, 12/8/00 (Tr. 316-19)**
- approached all portions of evaluation in very conscientious fashion; very pleasant demeanor
- Wechsler Adult Intelligence Scale Test:
      - verbal sections:
           - vocabulary: 7
           - similarities: 7
           - arithmetic: 8

             - digit span: 5
             - information: 9
             - comprehension: 8
             - for a sum of scale scores of 45, which is equivalent to a verbal IQ of 85, placing him in the 16th percentile
       - performance sections:
             - picture completion: 8
             - digit symbol-coding: 4
             - block design: 7
             - matrix reasoning: 10
             - picture arrangement: 8
             - for a sum of scale scores of 37, which is equivalent to an IQ of 83, placing him in the 13th percentile
- Wide Range Achievement Test:
       - reading: 83 - 13th percentile
       - spelling: 68 - 2nd percentile
       - arithmetic: 76 - 5th percentile
- Weschler Memory Scale:
       - auditory memory: 50 - .1 percentile
       - visual immediate memory: 65 - 1st percentile
       - immediate memory: 47 - .1 percentile
       - auditory delayed memory: 58 - .3 percentile
       - visual delayed memory: 56 - .2 percentile
       - auditory recognition delayed memory: 55 - .1 percentile
       - general memory: 47 - .1 percentile
       - working memory: 85 - 16th percentile
- assessment: significant memory function that greatly inhibits his ability to keep information in his mind and operate on it as he carries out a variety of tasks

**Neuropsychological Examination, Dr. Haut, University Health Associates, 12/8/00 (Tr. 320-22)**
- evaluation: results are consistent with individual who sustained a concussion and has lingering post-concussive syndrome; likely complicated by longstanding diabetes and recent development of hypertension

**Addendum to Examination, Dr. Crabtree, Medical Consultants Network, 3/10/01 (Tr. 323-24)**
- patient has not reached maximum medical improvement
- complete reacquisition of memory skills may not be possible, but retraining would then take place until there is a leveling off of gains made

**Initial Consultation Note and Authorization Request, Dr. Martin, 3/19/01 (Tr. 214-17)**
- history: referred by Dr. Voelker of neurosurgery.  Main complaint is dizziness; associated symptoms of ringing and a sensation like there is cotton in his ears.  Also reports headaches.

Wife reports personality changes, irritability, and tempermental.
- impressions: neck pain, status post vervical fusion at C6-C7, good surgical result; head injury with subsequent neuropsychological symptoms, currently being treated; dizziness, not actively treated; nasal congestion and sleep apnea symptoms; headache at site of injury
- plan: cannot relate any of his nasal symptoms nor his symptoms of sleep apnea to this claim; return to Dr. Wetmore for dizziness; no further therapy for neck; estimated return-to-work of June 19, 2001

**Outpatient Progress Note, Dr. Martin, University Health Associates, 5/21/01 (Tr. 329-30)**
- objective: no acute distress while sitting: dizziness when attempting to stand; eyes show no nystagmus; ears show clear, normal tympanic membranes bilaterally; nasal mucosa is quite boggy and erythematous; neck has no adenopathy or mass
- assessment: post-traumatic dizziness, unchanged over past year; allergic rhinitis
- plan: Flonase; vestibular rehab

**Outpatient Progress Note, Dr. Martin, University Health Associates, 8/22/01 (Tr. 333-34)**
- subjective: status post C6-C7 fusion; longstanding dizziness
- objective: staggering and running hand against the wall while walking around building; no nystagmus noted; examination of ears unremarkable
- assessment: severe self-reported dizziness but high self-reported functional status and concern of a nonorganic basis based on physical therapy evaluation
- plan: no diagnosis as to why there is such a high degree of vertigo; notable discrepancies between his functional status and his reports of the severity of his dizziness; some inconsistencies documented by the physiotherapist

**Independent Medical Examination, Dr. Doyle, WVU Department of Occupational Medicine, 9/28/01 (Tr. 335-39)**
- chief complaint: patient presented a list of complaints; however, when I ask him to spontaneously recall the list, he actually does a pretty accurate job of replicating his written list. Complaining of neck pain with numbness in tips of fingers of both hands; lower back pain with pain going down left thigh; short-term memory loss; pain in left upper mandibular area; some ringing in ears; dizziness; pain in upper teeth; pain in outer left thigh; short-tempered; frustration; memory problems; difficulty sleeping; complains of flashbacks of injury; breathing problems through left nostril
- physical exam: pleasant; slow to respond; HEENT exam reveals very large inferior and middle nasal turbinates without any sign of frank nasal obstruction; TM normal; limited range of motion in neck; normal motor and sensory exam; Phalen's test and Tinel's tests are negative; movement is hesitant and difficult to understand; normal cranial nerves without any sign of nystagmus or diplopia
- assessment: fractured maxilia, resolved without impairment; avulsion fracture of two upper teeth, resolved with residual symptoms but without impairment; postconcussion syndrome with memory deficits and emotional deficits, still not at MMI but, most probably, with significant impairment currently; post-traumatic dizziness without true vertigo with a mild degree of impairment; possible post-traumatic stress disorder, diagnosis needs further confirmatory

evaluation; change in sense of smell without loss of smell and, therefore, no permanent partial impairment; herniated disk at C6-C7 status post AP repair with residual impairment caused by pain and slight decrease in range of motion; insulin dependent diabetes; breathing difficulties with allergic rhinitis; possible sleep apnea; bilateral mild carpal tunnel syndrome and mild peripheral neuropathy secondary to diabetes, without any signs of cervical disk radiculopathy
- conclusions: physical impairment equal to 20%: 16% whole person due to herniated disk and decreased range of motion; 5% impairment of eighth cranial nerve; mild to moderate mental status impairment and emotional impairments; no indication he has not received treatment or rehabilitation for these problems; probably has additional impairment due to closed head injury; probably some impairment due to psychiatric aspect of the injury; not at MMI from neurologic, central nervous system and psychiatric components

**Medical Report, Dr. Parsons, University Health Associates - Department of Behavioral Medicine and Psychiatry, 10/14/02 (Tr. 340-44)**
- WRAT-3-Reading Subtest: low average range at an 8th grade equivalency
- reading comprehension test: similar to WRAT-3
- verbal memory test: severely impaired
- memory test for visuospatial information organized into a form of simple drawing: impaired
- Wechsler Adult Intelligence Scale-III
        - full scale IQ: 82
        - overall functioning: low average range
        - verbal IQ: 82
        - performance IQ: 85
- WAIS-III:
        - verbal comprehension index: 88 (low average)
        - perceptual organization index: 93 (average range)
        - working memory index: 75 (borderline)
        - processing speed index: 79 (borderline)
- impressions/ recommendations: low average range intellectual functioning, consistent with reading skills; level of memory impairment not particularly consistent with his presentation during interview in which he was able to recall numerous specific details about information such as blood glucose levels at different times in the recent past; scores were markedly poorer than performance approximately two years ago - discrepancy may indicate poor effort on memory tasks, exaggeration of memory difficulties, or a conversion disorder

**Psychiatric Independent Medical Examination, Dr. Clausell, University Health Associates, Department of Behavioral Medicine and Psychiatry, 6/13/03 (Tr. 345-50)**
- mental status: did not exhibit any signs of anxiety; appeared healthy and appropriate; alert and oriented times 4; intention and concentration during interview were good; denies any auditory or visual hallucinations or illusions; thought processes are goal directed; no difficulties finding words or answering questions quickly; general fund of information is adequate; recent memory is fair; some difficulty with remembering; remote and past memory are fair to good
- diagnosis:
        - Axis I:   post concussive syndrome, residual state, mild

- Axis III: head and neck injury
- Axis IV: stresses include inability to find work, frustrations with both cognitive and physical limitations
- Axis V: GAF of 85
- assessment/ conclusions/ opinions: post concussive syndrome - reached maximum medical improvement; has short-term memory problems and problems maintaining concentration

**Medical Records, Stearns Family Health Center, 8/22/03 - 7/22/04 (Tr. 378-84)**
8/22/03: letter requesting psychological evaluation
9/8/03: requesting approval for full psychological evaluation; continues to suffer from post concussive syndrome
11/24/03: asking for job search to be discontinued due to dizziness, lethargy, and vertigo; requesting rehab program to train for a different job
1/15/04: requesting approval for counseling sessions with Dr. Boone
4/12/04: requesting approval for therapy with a chiropractic clinic
7/22/04: subjective findings - memory problems, vertigo symptoms, neck and back pain

**Neuropsychological Evaluation, Dr. Boone, Wedgewood Family Practice and Psychiatry Associations, 9/19/03 & 10/3/03 (Tr. 351-56)**
- results: extremely unsteady gait; dramatic presentation of symptoms; affect was generally euthymic; especially long response latencies on memory tasks; effort levels suspect through evaluation procedure; unlikely we have an accurate assessment of Claimant's current level of cognitive ability; basic speed of cognitive processing was in low average range; attention and concentration was in mild-to-moderately impaired range; cognitive efficiency and flexibility was within normal limits; sustained attention and concentration was in moderate-to-severely impaired; auditory working memory was in moderately impaired range; learning through repetition task performance within severely impaired range - very poor performance on test is not likely to be an accurate reflection of his memory abilities because of reduced effort levels; visual abstract reasoning and concept formation task performance in average to high average range
- conclusions and recommendations: results are difficult to interpret; Claimant performed extremely well on many tests, but performance was severely impaired and suggestive of deliberate attempts to produce cognitive symptomatology on tests of memory and attention and concentration - number of factors which call into question the validity of those test rests; degree of memory pathology suggested by test performance is not consistent with his ability to report his symptoms during the clinic interview and his report that he is able to perform various chores around the house; postconcussion syndrome

**Medical Records, Wedgewood Family Practice & Psychiatry Associates, 9/23/03 - 2/7/08 (Tr. 359-77)**
4/5/04
- at this point, little progress has been made
7/12/04
- unlikely to benefit from additional psychotherapy sessions

<u>11/21/06</u>
- feeling sore all over; trouble remembering things
<u>12/6/06</u>
- progressively feeling better; still some trouble remembering; sleeping problems; diabetes under control
<u>1/2/07</u>
- sleeping problems; pain in neck and hip; headaches
<u>2/1/07</u>
- pain is bad; mood still down at times
<u>3/28/07</u>
- tendonitis flaring up; diabetes problems with stress; sleeping problems
<u>8/20/07</u>
- neck pain; upset because can't smell
<u>11/9/07</u>
- quit smoking; mood fluctuates
<u>2/7/08</u>
- pain has been interrupting sleep; troubles with vertigo

**<u>Mountain State Spinal Care Member History, 12/10/04 - 6/9/06 (Tr. 242-49)</u>**
<u>12/10/04</u>
- current health condition: neck pain; numbness down left arm and hand; lower back pain; numbness on outer left thigh
- diagnosis: atlas subluration complex moderate degenerative disc disease; mild degenerative joint disease
<u>12/17/04</u>
- complaint: neck pain and soreness; vertigo is strong; left arm is tingling
<u>12/31/04</u>
- complaint: neck pain; sinuses congestion cleared; dizziness worse; tingling in left arm
<u>1/6/05</u>
- complaint: LBP is not present; left arm tingling; neck pain; sharp head pain
<u>1/14/05</u>
- complaint: LBP for past several days; illegible
<u>1/20/05</u>
- complaint: no change in left neck pain; LBP with walking; left forearm and hand are having tingling and sharp pains
<u>1/28/05</u>
- complaint: change in neck pain; left forearm is tingling
<u>2/10/05</u>
- complaint: severe neck pain and left forearm pain
<u>2/25/05</u>
- complaint: neck pain; sharp head pain; LB is achey; last correction eased neck pain; vertigo is less
<u>3/11/05</u>
- complaint: severe LBP and severe neck pain

3/18/05
- complaint: severe neck pain; increasing LBP
3/25/05
- complaint: some neck pain on and off; LB is doing better
4/1/05
- complaint: sinus congestion; less LBP and beck pain is about same
4/15/05
- complaint: sinus congestion; LBP for past several days; neck pain and sharp head pain
5/13/05
- complaint: severe headaches and beck pain; LBP; hands and arms are numb
6/10/05
- complaint: LBP; neck pain; headaches
7/8/05
- complaint: less intense headaches; LB is feeling good; left fingers are numb; vertigo
8/19/05
- complaint: headaches; LBP; vertigo
9/15/05
- complaint: LB discomfort; neck pain; headaches
10/21/05
- complaint: LB discomfort; neck pain; headaches less frequent
12/9/05
- complaint: LBP and neck pain; headaches; left arm pain
1/6/06
- complaint: less intense neck pain; headaches; neck feels good when in alignment; LBP is improving
2/3/06
- complaint: restless sleep; LB; neck soreness; headaches
3/31/06
- complaint: LBP and neck pain; headaches
6/9/06
- complaint: neck pain; LBP; headaches

**Progress Note, Dr. Boone, Wedgewood Family Practice, 5/13/04, (Tr. 357)**
- continues to present with complaints of memory problems which do not fit the extent of hs very mild brain injury; appears Claimant is psychologically overwhelmed by the thought of returning to work

**Medical Records, Dr. Garrett, Lakeside Family Practice, 8/11/05 - 2/19/08 (Tr. 391-418)**
8/11/05
- chief complaint: diabetic
- assessment/ diagnostic impression: Type I DM; illegible
plan/ treatment: illegible
8/25/05
- assessment/ diagnostic impression: hyperlipidemia; Type I DM uncontrolled

<u>9/22/05</u>
- chief complaint: muscle pain; tired
- assessment/ diagnostic impression: hyperlipidemia
<u>2/8/06</u>
- discuss insulin pump
<u>9/13/06</u>
- chief complaint: hardly sleeping; neck pain; some trouble with blood sugar because of increased neck pain
- assessment/ plan: allergic rhinitis; Type I DM
<u>11/1/06</u>
- chief complaint: back pain; depression
- assessment/ plan: illegible
<u>11/20/06</u>
- chief complaint: flu; depression; neck pain keeps him awake at night
- assessment/ plan: prescription for depression
<u>2/2/07</u>
- chief complaint: DM and depression; no hypoglycemic episodes
- assessment/ plan: Type I DM; depression; HTN
<u>3/13/07</u>
- chief complaint: right elbow pain
- assessment/ plan: illegible
<u>3/30/07</u>
- chief complaint: right elbow pain
- assessment/ plan: illegible
<u>5/2/07</u>
- chief complaint: flu
- assessment/ plan: Type I DM; HTN
<u>6/25/07</u>
- chief complaint: flu
- assessment/ plan: illegible
<u>8/15/07</u>
- chief complaint: flu
- assessment/ plan: Type I DM; HTN
<u>11/16/07</u>
- chief complaint: flu; DM; HTN
- assessment/ plan: Type I DM; HTN - stable; depression - stable; illegible
<u>2/19/08</u>
- chief complaint: flu; DM; hyperlipidemia; HTN
- assessment/ plan: Type I DM; hyperlipidemia; HTN - not controlled; DM

**<u>Adult Progress Notes, Dr. Garrett, Lakeside Family Practice, PLLC, 11/22/05 - 6/7/06 (Tr. 237-41)</u>**
<u>11/22/05</u>
- chief complaint: FD, DM, illegible

- assessment/diagnostic impression: illegible
2/1/06
- chief complaint: corn on left foot
- assessment/plan: illegible
3/29/06
- chief complaint: discuss insulin pump results, increase or decrease due to stress and and decreased sleep and pain
- assessment/plan: illegible
6/7/06
- chief complaint: illegible
- assessment/plan: illegible

**Psychiatric Review Technique, David Allen, Ph.D., 4/5/06 (Tr. 200-13)**
- assessment from 10/2/99 to 6/30/00
- medical disposition: insufficient evidence
- notes: He alleges memory loss and concentration problems.  There is no MER for period of DLI

**Physical Residual Functional Capacity Assessment, Dr. Osborne, 4/12/06 (Tr. 228-36)**
- additional comments: insufficient MER prior to DLI.  The only MER in file prior to DLI is records of C6-C7 discectomy and fusion from 8/99.  Insufficient evidence

**Medical Eye Reports, Dr. Powell, Regional Eye Associates, Inc., 5/30/06 - 6/18/07 (Tr. 457-61)**
5/30/06: letter describing eye exam results
- same old fibrous vessels and vascular changes that were present last year
- one spot hemorrhage appearing to be chronic
- no threatening lesions to retina or macula
6/18/07: letter describing eye exam results
- vision of 20/20 uncorrected
- anterior segment is normal
- normal macula
- no evidence of diabetic retinopathy
- old spots in retina unrelated to previous sugar
- old fibrous vessels

**Psychiatric Review Technique, Dr. Hursey, 8/2/06 (Tr. 186-99)**
- assessment from 10/2/99 to 6/30/00
- medical disposition: insufficient evidence
- notes: there is evidence that he has some type of history with a head injury, but it is insufficient.  It looks like he has had an injury in 1999 but the MER does not seem to include any records from that time period.

**Physical Residual Functional Capacity Assessment, Dr. Franyutti, 9/25/06 (Tr. 250-58)**

- additional comments: evaluated by ENT for dizziness; studies were recommended, but they are not in file.  No FU is available from that evaluation.  His MER reports good result from his neck surgery.  This is the only evidence from the AOD to DLI.

**Letter from Rachel Czajka, LICSW, Wedgewood Family Health Center, 5/24/07 (Tr. 388-90)**
- depression improving; biggest challenge is learning to live with pain, vertigo, and numbness and to cope with stress, anxiety, and concentration difficulties; poor prognosis to return to previous levels of functioning

D.     Testimonial Evidence

Testimony was taken at the hearings held on November 8, 2007, and March 6, 2008. The following portions of the testimony are relevant to the disposition of the case:

Q     And how tall are you?
A     I think 5' 6 and ½".
Q     And about how much do you weigh?
A     It's, I think it was 180 something.
Q     Okay.  Have you maintained your weight, I mean, has your weight been fairly stable over the last year or?
A     Up and down.
Q     In what range do you normally fluctuate?
A     That I, to be honest with you I can't, I don't know.
Q     Okay.  What's the heaviest that you think you've weighed?
A     Probably right now.
Q     185 or so?
A     Something like that.
Q     Okay.  What's the least amount that you think you've weighed, in the last year?
A     In the last year, maybe 160 something.
Q     What do you attribute your weight fluctuation to?
A     Probably just sitting around because I just don't have the ability to do things like I used to.

                    *                    *                    *
Q     And you live in a single family home - -
A     Yes.
Q     How many floors do you have?
A     Just the upper living floor and basement.
Q     Okay.  Do you have a washer and dryer in the basement?
A     Yes.

                    *                    *                    *
Q     Do you have any pets?  Dogs, cats?
A     Dog.

Q	Just one?

A	Just one, yes, sir.

Q	And do you keep the dog outside or - -

A	No, inside.

Q	Do you have to take any steps to get into your house?

A	Inside, no, sir, the house.  One, two, two, two steps.

Q	Do you maintain your yard?  Do you mow it?

A	Yes, sir.

Q	Do you use a, a power mower or do you use a riding mower?

A	It's a riding lawn mower.

Q	Do you bag your grass or just clip it?

A	Well, we have a, well I usually just let it mulch up in the yard.

Q	Okay.  Do you have a valid motor vehicle license?

A	Yes, sir.

Q	And how often, in a typical week at the present time, do you drive?

A	That's, I'd like to be truthful but I just can't, you know, I sometimes I don't even move the vehicle.

Q	Other times you may go to the grocery store or?

A	Yeah, and maybe to the bank and that's it.

Q	And how far would those trips be to the grocery store and to the bank?

A	A round trip, maybe about five miles, no, eight miles to the grocery store.  And about six miles to the bank.

Q	Okay, so you live in a fairly rural area?

A	Yes, sir.

Q	The, when you make those trips, you drive by yourself?

A	Yes.

Q	How many - -

A	Well, sometimes.  I mean, sometimes my wife goes with me.

Q	Right.  But, I mean, you can, you can make those trips by yourself?

A	Right, right.

*                    *                    *

Q	Okay.  I want to go through your educational training.  You, you graduated from high school?

A	Yes, sir.

Q	Did you have any college after high school?

A	I had trade college - -, trade school.

Q	Auto - -, let's see, it says auto, auto mechanic school?

A	Yes, sir.

Q	In 1982?

A	'81.

Q	And you successfully completed that?

A	Yes, sir.

Q	And what, what specifically did they train you to do there?  Was that just to work on engines or was it painting and repairing cars - -

20

A      No, it was just mechanical, you know, from the brakes on up to the engine. No transmission.

Q      All right. Any other educational training besides high school and the auto mechanic school?

A      No, sir.

              *          *          *

Q      So, when you were looking for work what types of jobs were you looking for?

A      Stuff that was in my background, you know.

Q      Auto mechanic?

A      No, not necessarily the auto mechanic. It's more or less, more or less like the building homes, you know, stuff of that sort.

Q      Had you done some carpentry work in the past?

A      Yes, sir.

Q      And was that something that you learned on the job or, normally you have to have some type of training to do that - -

A      Right. Well, I had friends that were carpenters and had their own business and you know, I'd just help them out whenever they needed some help and.

Q      Okay.

A      Plus plumbing. I used to do that.

Q      And was that, did you, were you ever involved in any type of formal apprentice program, either in plumbing or carpenter?

A      I was about to in, in, before we moved out here.

              *          *          *

Q      I want to go through your work history briefly. With the time you got hurt you were working at Lowes. And what were you doing there?

A      I was in the plumbing, sales.

Q      Waiting on customers?

A      Yes, sir, and helping them out.

Q      And it says here you did that from about 8/97 to 2/99.

A      Right.

Q      Now, did you ever go back to work at Lowes?

A      Yes, I did.

Q      And for what period to time?

A      Maybe about a month, maybe.

Q      Okay.

A      After my teeth were okay to go back to work.

Q      Okay - -

A      They were wired. And, and they put me on light duty which I was just answering phones and I had problems with that because I couldn't remember what sections were supposed to go to.

Q      Okay. Now, how much weight did you have to deal with in that job?

A      A good bit.

Q      Okay. Because you might have to move, move plumbing supplies around or - -

A      Like the hot water tanks.

Q       But primarily you were waiting on customers or - -

A       Right.  And also stocking shelves, pulling down.

Q       Now before, it says here then before that that you worked McDonalds Quick Oil Change.

A       Oh, McDouglas [phonetic].

Q       Okay, McDouglas.

A       Uh-huh.

Q       And that was just a place where people would bring their cars for service, for oil?

A       It was a full service type of mechanic shop.

Q       Okay.

A       But he wanted me to put up a quick oil change bays, you know, like the one stall - -

Q       Uh-huh.

A       - - and I was in charge of setting those up.  Reading the blueprints from that.  And going out to the site and setting them up.  We set up one in Ohio.

Q       Okay.  But, what, so what was you, what did you do there?  Did you actually work on cars or was it more setting up the - -

A       I did a little, I did a little bit there wherever they needed.  Plus maintenance on the garage.  And also getting ready for the construction of the quick oil change bays.

Q       So, did you actually work on the cars?  I mean, did you actually the, any - -

A       Yes.

Q       - - mechanical work?

A       Yes, I did.

Q       Why did you stop doing that?

A       I think the love of music.

Q       Okay.  So, did you play in a band or something?

A       Yes, sir.  Semipro.

Q       I'm sorry?

A       Semipro.

Q       Okay.  And what, what, what type of music did you play?

A       Top 40 and country.

Q       Do you still do that?

A       No, I don't.

Q       Do you still practice?

A       No, I don't.

Q       When's the last time that you - -

A       It was before the accident.  I had the drum set set up and that's it.

Q       So, you, you quit the work at the quick oil change because you were playing in a band more or?

A       Let's see, that was.  No, the mechanic side, just the mechanic.  You know, when I went through school with.  But - -

Q       Well, you told me that you quit, you quit the working for the quick oil change or McDouglas, I thought because you said for love of music.  That's what I - -

A       No, I thought you meant with the Progressive of, the schooling.  You know, with

22

the mechanics.

Q        Okay.  But why did you quit working for the - -

A        Well, I was actually, well with that one, I was laid off and was [INAUDIBLE] of that shop.  If you went to get, what is it called, unemployment?

Q        Uh-huh.

A        He would fire you automatically.  So.

Q        All right.  Well, now I'm a little confused.  You, you wouldn't go for unemployment, presumable unless, unless you, you had, he had - -

A        No, he laid me - -

Q        - - laid you off.

A        - - he laid us off.

Q        Okay.

A        He laid a couple of us off and - -

Q        All right.

A        - - you know - -

Q        And what you're saying is that if you went and applied for unemployment then he wouldn't take you back?

A        Exactly, exactly.

Q        Okay.

A        And he was kind of like a dirty little scoundrel.  I mean, he didn't pay all of his taxes and stuff, so.

Q        Okay.  So, you got laid off there - -

A        Right.

Q        - - and then you went to, about how long were you, did it take you to find work at Lowes?

A        It was about maybe a year, I think.  I'm not really sure.

Q        Okay.  So, tell me about the prior two, that it shows that you didn't have any reported wages to the Social Security Administration in '93, '94 and '95.  Were you working in those years?

A        No, sir.

                    *                    *                    *

BY ADMINISTRATIVE LAW JUDGE:

Q        There's some wages from HR Ebersol and Sons.  They have an address in Maryland.

A        Yeah, in Hagerstown.

Q        Okay.

A        That was the plumbing.

Q        Plumbing?  And what was, you had some wages from Tour Lease, Inc.

A        Tour Lease?  That's Bob's Tour Buses.

Q        Okay.  Did you drive a bus or what did you do?

A        No, no, no.   Not with diabetes, you couldn't.  No, I just did the office work for him.

Q        What type of, in other words, you basically took calls from people about the bus tours?

A      Exactly and arranged them.

Q      So was that, I'd say, would that be more of a desk type of job?

A      Yes, sir.  And plus I did some mechanic work for him, on the buses and leaned those up, and.

Q      Did, so what exactly did you do from that end of it, from the standpoint of, of making arrangements for the bus tours?  Would you just, people would call and you would just, you know, sign them up for a particular tour or did you actually talk with the hotels where the, you know, the people would go on the bus tours or make arrangements for that type of thing?

A      No, I did all of it.

Q      Why did you stop doing that?

A      He was running into financial problems.

Q      Okay, so he, he laid you off?

A      Basically, yeah, but we were mostly friends, so, you know, he just helped me a little bit when I was kind of like down a little bit, so.

Q      Okay.  So, you had then, before that it looks like you had worked at Hagerstown Canteen Service for, in '89 and '90.  Can you tell me what you were, what your job was there?

A      I had several different ones.  I, I was stocking.  It was warehouse type of work.

Q      Can you tell me generally what the business did?

A      It's a junk food machines and you just filled those.

Q      They would put machines in various locations and then someone would have to go around and - -

A      Right.

Q      - - service the machines.

A      And I did that also.

Q      So you worked in the warehouse and you also basically serviced the machines?

A      Yes, sir.

Q      How much weight did you have to deal with in that job?

A      There was a good bit.

Q      Which would be like the boxes of food and stuff - -

A      Well, you had coolers of milk for one.  You know, it's not those little coolers, it's a pretty good size.  Then you had sandwiches in there for the sandwich machines.

Q      And - -

A      And plus the money.  Oh, I'm sorry.

Q      Right.  You had to collect the money and - -

A      Right.

Q      - - and then turn it in or - -

A      Exactly.

Q      - - account for it?

A      That's how you got paid.

Q      That's how you got paid?

A      Yes.

Q      How - -

A      They'd figure up how much you sold then you'd get a check on commission, type of deal.

               \*            \*            \*

Q      You did some plumbing for a Benny Roger, B & B Plumbing.

A      Right, in Hedgesville.

Q      And, and you worked for West Virginia Society for the Blind.

A      Yes, sir.

Q      What, what type of work was that?

A      Clean the restrooms at the rest stops.  Filling the machines and fixing the - -

Q      Basically you were servicing the rest areas on, on the highways or?

A      Yes, yes.

               \*            \*            \*

A      Yes, sir.

Q      And was that like a part-time job or?

A      Yes, it was.

Q      So, as you sit here today tell me, tell me why you're not able to work.  Tell me what you feel is the most serious problem and how that affects your ability to work.

A      Well, I've got that short term memory.  And the, shoot, I forgot what I was going to say.  Short term memory.  And the vertigo.

Q      So what happens?  When do you get vertigo?

A      When I'm in buildings with different lighting.  L:ike different fluorescent, if different, the gas tube, the gas bulb lights.

Q      Now - -

A      I mean my eyes become very sensitive to the flickering.

Q      Do you, do you have you ever worn any type of - -

A      Sunglasses?

Q      Sunglasses?

A      I have done anything and everything possible.

Q      So do you see somebody for that at the present time?

A      No, sir.

Q      Who, who last treated you for that?

A      I can't even remember there's been so many doctors back then.

Q      Do you know approximately when you were last treated for it?

A      No, sir.

Q      Now, you, you take, you have an insulin pump?

A      Yes, sir.

Q      And how long have you had that?

A      A couple years.  About two years.

Q      Okay.  And well, before that how did you control your - -

A      Injections.  And diet.

Q      And how long have you had your diabetes?

A      Since I was 16 months old.

               \*            \*            \*

Q      All right.  So, tell me about your daily activities.  Give me a typical day at the present time.  What time you get up, what you do in the morning, what you do in the afternoon, what you do in the evening.

A       When I get up it's in the hours between, about 2 to 6.  And I make Pam's lunch for her.

Q       What time does she normally go to work?

A       She changed.

Q       Okay.  What - -

ATTY       What time does she go to work now?

CLMT       That's what I'm trying to remember.  It's 5:30 - -, 5:45.  5:45.

ATTY       In the morning?

CLMT       Yeah.

BY ADMINISTRATIVE LAW JUDGE:

Q       Okay.  So, what time does she normally come home?

A       It's about 2:30.

Q       All right - -

A       2:30.

Q       And, so, you get up with her?

A       I, most of the time I get up above, before her.

Q       Okay.  And so then you make her some lunch?

A       Yes, sir.

Q       And once she's gone then what do you do?

A       I either watch the news or go and read emails and then I get, have a, what is it?  A treadmill that I walk on.  And try and do some exercise.  And play around with the dog.

Q       So do you, do you send emails to other people?

A       Yes, sir.

Q       Who do you keep in contact with?

A       Oh, some of the friends that I have, left back in Martinsburg.

Q       The, do you, when you do, do you look at, oh, look at information on the, like news or other types of things on the  - -

A       Yes, I do.

Q       - - computer?

A       Yes, I do.  I look at the hometown news.  Go into HGTV and DIY stuff.

Q       So, do you work around the house?

A       Yes, sir.

Q       What type of things do you do around the house?

A       Well, Fridays is what I call my Hazel day.

Q       Okay.

A       I don't know if you remember the show, Hazel.

Q       Probably not.

A       Okay.  It's a maid, she, you know.  I do the laundry and clean the house.  Plus I do this on Wednesdays also.  I keep the loads light.

Q       And when you mow the yard how long does it take you to do that?

A       Oh, it takes about three hours.

Q       Do you, do you take the dog out during the day - -

A       Oh, yes, oh, yes.

Q       - - for walks or things of that nature?

A       Yeah, she tries to walk me.

Q       Okay.  Do you have hobbies, things that you like to do?

A       I sure do.

Q       What types of things do you do?

A       I like to do stuff with wood.

Q       So do you have a wood shop?

A       No, I don't.  But, you know, I just look at things and thinking if, whenever I could get one, you know, these are the things I'd like to do.  I put them to the side, you know, keep a library of them.

Q       Okay.  So, do you work on models, or you said, you, I mean.

A       Well, that's the only thing I really do.   It's just, it's like a wish list.

Q       Uh-huh.  So, do you ever do any things on the wish list?

A       Sometimes.  If they, you know, or, you know, that I can comprehend.

Q       So how about the, do you fix the evening meal?

A       Yes, sir.

Q       When you go to the grocery store do you, sometimes you go by yourself, sometimes you go with your wife?

A       It's most of the time I go with Pam.

                     *              *                *

Q       Okay.  So, do you have friends that you see during the day?

A       Sometimes I do.

Q       Where do you see them?

A       At their house.

Q       How far do they live from where you live?

A       Maybe about ten minutes.

Q       Do you do any plumbing?  I mean, if you have a problem with your toilet, the valve thing won't - -

A       Yeah, I did, but it just takes me an awful long time to, you know, get it done.

Q       Do you help out any of your friends if they have a particular problem?

A       I do.

Q       Uh - -

A       And they consider, you know, that it takes me a while.

Q       So, do you, do you and your wife do things outside the home?

A       Yes.

Q       What types of activities do you do outside the home?

A       We love gardening.

Q       So you have a garden?

A       Yes, sir.

Q       Do you go on trips?

A       Like a vacation?  Yes.

Q       Typically where do you go when you do that?

A       Outer Banks.

Q       And you drive there?

A       Yes, sir.

Q        Do you, do you share the driving?

A        No, I do most of the driving because since the accident I get carsick.  Severe carsick.

Q        So, you don't get sick if you're doing the driving?

A        Sometimes I do, but most of the time it's, you know, if somebody else is driving and I, I don't understand it.  I mean, I never did.

Q        But it, but it, you get, it's easier for you to do the driving as opposed to sitting in the car and travel?

A        Right, right.

Q        Okay.  When you're at the Outer Banks do you go, you know, do you go fishing or what types of things do you do there?

A        We used to go fishing.  Just mostly just relax.

Q        Do you go lay on the beach or?

A         Yes, sir.

Q        Do you go to church?

A        No, sir.

Q        Now, besides working with your wish list, do you do any of these activities that you talked about before?  Like going rock climbing or things of that nature?

A        No.  Sure do miss doing that.

Q        Do you and your wife go out to eat from time to time?

A        Occasionally.  But we're not too much of going out to eat people.

                              *                    *                    *

Q        Okay.  So, tell me, if you had a job where you were working in an office doing paperwork do you think you could do that type of work?  Because you had some history of doing that, I mean - -

A        Right.

Q        - - apparently you did that when you were working in, at least to a certain extent when you were working in the tour people, or the tour company.

A        Right.

Q        And maybe some of that in the canteen, at least you had to do paperwork, I guess, when you filled out your, when you were running route and stuff like that.

A        Right.

Q        So, do you think you could do something like that?

A        I don't really think so. I really don't - -

Q        Okay.  So, tell me what, what problems you think you would have if you tried to do something like that?

A        Okay, for instance like, with answering the phones, you know, I probably wouldn't even remember where the tours were.  Or you know, where to put certain stuff.  I mean, I have that problem at home.

Q        All right.  From a, do you have any, besides your vertigo, do you have any other problems physically?  And your, in controlling your insulin?

A        Oh, yeah, the worry about what's ahead of me.

Q        Now, what do you mean by that?

A        What's going to become, you know.  I've been trying to find people to help out,

28

you know, to get my, get better.

Q      Okay.

A      I've been trying to do that all along on myself and - -

Q      Well, you've had some treatment though. You've been seeing this, the counselor at -      A      Right, right. I mean, that, you know, I might think about doing that again and I, now it's a bad feeling. I mean, really bad.

*                    *                    *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q      Will you please tell the, the, the judge what your sleeping habits are and how you have to sleep?

A      Yes, I have to sleep propped up and I can sleep maybe three, maybe four hours at the most.

Q      And then what happens?

A      And then I'm up and watching the TV. Because my neck is killing me or, or I get into a position of vertigo.

Q      What time do you usually go to bed at night?

A      About 8 - - , let's see, 9, 10, something like that.

Q      You mentioned that sometimes you do houseworking on Wednesdays and Fridays. How do you feel the evening and the morning following doing housework? How does that make you feel?

A      Well, the neck is really sore. And numbness down my arm and fingers are.

Q      Gardening, what type of garden do you have and how large is it? And in terms of responsibilities, who does what?

A      She takes care of the flowers. I take care of the vegetables.

Q      How large is your garden?

A      Let's see. We have raised beds which is 3 by 3. And I have plastic over top of that so I just slit the plastic and put the plant in. There's no weeding that way.

Q      Okay, and how many raised beds do you have?

A      I think about ten.

Q      You mentioned that sometimes that you drive. How long can you drive at any given stretch?

A      Maybe about an hour and I have to take a break.

Q      And how long do you need to take a break?

A      Maybe about 15 minutes or so. It just depends on the traffic and.

Q      When you come out to either come to my office or go to a doctor's office or come here today, how will that, how will that exertion affect you later that day or the following evening?

A      It's I just feel tired. Very worn out.

Q      Describe what the vertigo is.

A      Okay. It's, you're spinning. And things are going back and forth. And I get sweaty from it. And then after we come home I'm I'm just beat and just all I just want to do is lay down. And sickness, I get a very upset stomach with it.

Q      Now, this, I think the medical records would show this vertigo began to show itself in October of 1999, approximately eight months post accident. When you were in physical

29

therapy in Fairmont, is that correct?

    A      Yes.

    Q      And does it continue to the present day?

    A      Yes, it does.

    Q      Has it gotten any better?

    A      No.

    Q      And in order for you to remember chores around the home or things that you're required or you need to do during the day, how do you remember to do those things?

    A      Well, the wife takes all those, those post-it notes.  And if one falls it doesn't get done.  Off the wall.  That she puts it on - -

    Q      Where, where, what wall?

    A      In the kitchen.

    Q      She, she makes the post-it notes?

    A      Yes.

    Q      Do you and she discuss the night or the day before what your activities are?

    A      Right.

    Q      And then she writes them down on the post-it notes?

    A      Right.

                   *              *              *

(The Witness, PAM SENCINDIVER, having been first duly sworn, testified as follows:)

    Q      So, you've heard your husband's testimony concerning the types of things that he does at the present time.  The, he mentions you leave him notes?

    A      That is correct.

    Q      And why do you have to do that?

    A      He just can't remember anything.  At all.

    Q      Now he complains that the notes fall down and then he doesn't do them.  Have you tried to just write those things out in a notebook so that he can just look at the notebook?

    A      Well, usually what I try to do is try to put them around the phone because at least once a day I'm calling him so I know if I'm talking to him on the phone that he's looking at those post-it  notes.

    Q      So, have you looked at a solution for the post-it notes falling down?

    A      I can't say that I have.

    Q      Okay.  So, the, can you tell me how his, you know, what changes you've seen in him since the, the accident - -

    A      Yes, Your Honor.

    Q      - - how he was before the accident and how he is now.

    A      Jeff has, used to have the patience of a saint.  Now he is, he's very short tempered.  He cannot multitask like he used to be able to.  He gets very irritated with himself when he can't complete something.  Or he gets in the middle of something and he doesn't know how to finish it.  He's not the type of person who willingly wants to admit that he cannot do something.  So, he gets frustrated very, very, very easily.

                   *              *              *

    Q      Okay.  So do you ever talk that over with any of his medical providers?

    A      Oh, yes.

Q Who do you talk with?

A Dr. Garret.

Q That's his family doctor or the doctor that treats him for his insulin?   I mean, his diabetes - -

A  Correct.  As well, as Dr. Sterns.  But Dr. Sterns has since passed away.

Q So, what issues do you discuss with Dr. Garret?

A Just his, his demeanor has changed.  He's not the same man that I've known for almost 30 years.

Q And when did his demeanor change?

A After the accident happened.

Q All right.  You apparently, I mean, he says that he does some of the housework.

A Uh-huh.

Q You go shopping together?

A Correct.

Q But you don't need, you don't make a list?

A Well, we're kind of like creatures of habit.  We basically eat the same thing every week, so if we go and we buy salmon then we know we need a vegetable.  Because we have to eat certain things for his diabetes.  You just, you have to somewhat plan it out.

Q Try to keep, you stick to a diabetic diet?

A Correct.

Q How about, does he go, he has a treadmill that he uses at home, he said.  Do you, do you ever go out and you know, walk in the neighborhood or do things like that to help control his blood sugar levels?

A I think what he does mainly is he walks the dog during the day.

Q But I mean, you and he don't go out at night to go walking or things or than nature?

A Quite honestly, Your Honor, when I get home he's pooped for the day.

Q Okay.  Anything else you want to tell me about his condition?

A The one thing that no one has touched on, that has really bothered me, it's not so apparent now since he's had his insulin pump, but and I'm trying to put myself in his position.  How he would feel with a head injury.  He's said that his head feels so funny now that with him being brittle diabetic he cannot feel when his sugar is dropping.  And he has been known to have horrible, horrible insulin reactions.  One such reaction recurred, occurred probably in 2000.  And what I used to do before the insulin pump, because I've just been around him for so long I know when he's having an insulin reaction.  I actually used to sleep with my hand on his arm and when his arm would get clammy I would know that he was going into an insulin reaction.  He would not know that.  So, one night, either I was tired or my hand slipped off of him or whatever the case may be, and he did have a severe insulin reaction where he went into convulsions.  And he popped, or broke the ball of his right shoulder.  His right shoulder off.  So, we had gone to the doctor for that  - -

Q This is back in 2000?

A I want to say around that area, yes.

Q Okay.

A     Around that time.  And it, it's just a really, really horrible predicament to be   in because I've become the one that's responsible not only for myself but for him.

Q     Well, let me ask you now, he's been on the insulin pump for a couple years now.

A     Uh-huh.

Q     Has that, has that been allowed better control of his diabetes with the insulin pump?

A     It has, however, it does, his sugar still does go low.  And he cannot tell when it goes low.

Q     Okay.  Does he carry any candy or things like that with him?  Sugar pills?

A     Yes, he does.  But the problem with that is, Your Honor, is that if he doesn't know that, if he doesn't feel that it's going low then he doesn't know to take something to bring it back up.

Q     Does he test him - -, does he, is he supposed to test his blood sugar levels at various times if he has an insulin pump?

A     And he does.   However, with being a brittle diabetic, it can happen so quickly.  I mean, sometimes there's just, it just happens.

Q     Okay.

*             *             *

EXAMINATION OF WITNESS BY ATTORNEY:

Q     How has, he has mentioned, and you are aware of his vertigo and short term memory loss.  First question, did he have or exhibit any memory loss or the vertigo prior to this accident?

A     No.  Absolutely not.

Q     After the accident, is that when the vertigo and the short term memory loss manifested itself?

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q     The claimant was born on February 20, 1962, would be considered as a younger individual at all times relevant, since he's under the age of 50.  He has a high school education based on his testimony that he graduated from high school.  He also has some formal vocational training in the field of automobile mechanic based on his testimony.  Concerning the vocational evidence of record do you agree with that assessment?

A     Yes, Your Honor.

Q     For the claimant's past relevant work, work he's done long enough to learn how to do the job and at significant gainful activity levels, would tell us how that, those jobs are customarily performed in the national economy from a standpoint of the exertional and skill level and if he performed them differently, then how they're customarily performed.  Tell us how they're customarily performed in the national economy.

A     Work as a hardware, hardware and plumbing sales person.  Exertional level is medium, skill level is semi-skilled.  Work as a mechanic.  Exertional level is medium, skill level is skilled.  Work as a plumber.  Exertional level is heavy, skill level is skilled.  He also worked some time as a tour bus agent.  Exertional level is light, skill level is semi-skilled.  He had work as a vending machine attendant.  Exertional level is light, skill level is unskilled.  And I think he also stated he worked in a warehouse - -

Q     Yeah, I think in the context of the, doing the canteen - - , working for the canteen company.  That's right.

A     That type of work would be, exertional level would be medium and skill level would be unskilled, Your Honor.

ALJ     When you worked in the canteen warehouse did you drive a forklift or how did you, how did you move the stuff around?

CLMT     It was a hand truck type deal.

ALJ     Oh, the pneumatic hand truck, I mean - -

CLMT     Well, yeah, with, it's like a forklift but it's a, you know - -

ALJ     Right.  You pump the handle - -

CLMT     Right.

ALJ     - - to get the forklift to go up and down.

CLMT     Right.

ALJ     Was it motorized or not?

CLMT     No.

ALJ     Okay.

BY ADMINISTRATIVE LAW JUDGE:

Q     And what, tell me what - -

A     It would be medium exertional level and unskilled, Your Honor.

Q     Okay.  All right.

ALJ     Do we have functional statements from any of the claimant's treating doctors?

ATTY     When you say functional statements do you mean is he capable of working?

ALJ     Well, either that or statements that say he's restricted from doing certain things.

ATTY     Yes, those are contained in those records.   Most of the doctors say they can't, they don't recommend that he work until he's able to get his vertigo and his, basically the vertigo and the dizziness under control because he could fall.

ALJ     Okay.

ATTY     Is that, is that, is that what you were requesting of me?

ALJ     Right - -

ATTY     That's, that's in those records.

ALJ     So, basically they're saying he shouldn't be working around dangerous, moving machinery, unprotected heights, things like that?

ATTY     Yes.  That, that's correct.  Any, any machinery.  Anything involving heights.  And any hard physical labor.

BY ADMINISTRATIVE LAW JUDGE:

Q     I want you to assume the claimant would be limited to light work.  Wouldn't be able to work at unprotected heights or around dangerous moving machinery.  And would be limited to jobs that would be simple, routine, one to three step tasks.  Would there be any, would he be able to do any of his past relevant work?

A     No, I don't believe he would be able to, Your Honor.

Q     Would there be any full-time, unskilled jobs such a hypothetical person could do

33

in the local and national economy with those limitations?  And if you'd identify the local economy when you give your answer.

A        The region I'll be using is all of West Virginia, Western Maryland, Western Pennsylvania and Eastern Ohio.  Under the light exertional level, a counter clerk.  575,000 nationally.  7,000 regionally.  Also, under the light exertional level a cafeteria attendant.  235,000 nationally.  2,400 regionally.  Those are a sampling, Your Honor.

Q        All right.  I'm going to ask you another hypothetical.  At the sedentary level with those limitations, the nonexertional limitations I gave you.  No work at unprotected heights or around dangerous moving machinery.  The, would there be any full-time, unskilled jobs, simple, routine, one to three step tasks, would there be any full-time unskilled jobs such a hypothetical person could do in the local or national economy at the sedentary level?

A        At the sedentary level, Your Honor, a general office clerk, 299,000 nationally.  9,000 regionally.  Also a callout operator.  79,700 nationally.  2,180 regionally.

Q        All right.

*                    *                    *

RE-EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q        Sir, tell me in a typical workday, all right, from nine to five.  And tell me what you're doing around the house during that time period.  How much time do you spend standing?  How much time do you spend walking?  How much time do you spend sitting?  In a typical day.  From nine to five.

A        It's about equal amounts of walking and sitting.

Q        Okay, so you might be standing and walking for four hours and sitting for four hours -

A        Oh, not that long but, you know - -

Q        Right, not at, but, right, not necessarily - -

A        Right, right.

Q        - - but if you accumulated the amounts of - -

A        Right.

Q        - - sitting and walking and standing half of it might be standing and walking and half of it might be sitting?

A        Right.  I mean, it's just, if I'm doing something I, they took a piece of bone out of my hip to put in my neck to fuse it - -

Q        Uh-huh.

A        - - and I have trouble with that.

Q        So you might have some pain, is that what you're saying?

A        All, not some.

Q        Well, how big of a piece of bone did they take?

A        I have no idea.  I was asleep at that time.

*                    *                    *

Q        So, the, how far can you walk without having to stop?  If you're walking on level ground.

A        If I'm walking on level ground and I measured it by the treadmill and it's about a half of mile and I start feeling it.

Q        About how long will it, does it take you to walk a half of mile?

34

A       See, I push myself, I try to do it at 20 minute mile.

Q       So, ten minutes?

A       Yes, somewhere around there.

Q       Okay.   The, how about just standing?  If you're working at a counter, doing dishes or, you know, working with something?  Can you stand for a half hour at a time without having to sit down?

A       Not too often.

Q       How long can you normally stand before you have to sit down?

A       Maybe, oh, I'd say about 15 minutes, approximately.

Q       All right.

                    *                    *                    *

RE-EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       I want you to assume a hypothetical individual, same age, education and work experience as the, as the claimant.  Who would be limited to doing sedentary work as I gave you in the previous question, but in addition, the individual could sit hour for six hours in an eight hour workday, but would have to be able to get up and change position about once every half hour for a few minutes and, but could sit for at least six hours in an eight hour workday.  Could stand or walk for at least two hours in an eight hour workday, but would have to be able to change position after standing or walking for 20 minutes.  Would there be any full-time unskilled jobs at the sedentary level and if the jobs you gave me in the previous answer to sedentary are still, would still apply you can just tell me that.

A       All the jobs would apply, Your Honor.

Q       Okay.  The general office clerk and the callout operator?

A       That's correct, Your Honor.

Q       All right, now I want you to assume a hypothetical individual the same age, education and work experience as the claimant that would have the ability to do light or sedentary work, but due to the individual's impairments they'd be off tasks two hours out of an eight hour workday.  Either because they weren't able to concentrate on the task or were dizzy or otherwise due to the individual's impairments would be off task.  Would there be any full-time unskilled jobs such a hypothetical person could do in the local or national economy with those limitations?

A       No, I would not be able to find any jobs, Your Honor.

Q       All right.  Same question, but different limitation.  Due to the individual's impairments they would be absent from work three days a month on an ongoing basis.  Would there be any full-time unskilled jobs such as a hypothetical person could do in the local or national economy at the sedentary or light level?

A       No, there would not be any jobs available.

                    *                    *                    *

E.       Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- makes his bed (Tr. 119)
- fixes his wife's lunch (Tr. 119, 516)
- plays with, cares for, and walks the dog (Tr. 119, 120, 517, 518)
- fixes dinner (Tr. 119)
- watches television (Tr. 119, 123, 516)
- sends emails (Tr. 119, 123, 516)
- can no longer drive long distances by himself (Tr. 120)
- has trouble sleeping (Tr. 120, 523)
- no problems with personal care and hygiene (Tr. 120)
- forgets what medicines he has and has not taken (Tr. 121)
- prepares own meals (Tr. 121, 518)
- does household chores, including cleaning and laundry (Tr. 121, 517)
- does household repairs (Tr. 121)
- mows the lawn and gardens (Tr. 121, 517-18)
- goes outside everyday (Tr. 122)
- is able to drive (Tr. 122)
- feels uncomfortable going out alone (Tr. 122)
- is able to shop in stores (Tr. 122)
- grocery shops (Tr. 122, 518)
- is able to pay bills, count change, handle a savings account, and use a checkbook/money order (Tr. 122)
- takes short walks (Tr. 123)
- spends time with others (Tr. 123, 519)
- needs reminded to go places (Tr. 123)
- has short temper (Tr. 124)
- can walk for 30 minutes before needing to rest; is able to resume walking after 10 minutes (Tr. 124)
- can walk half of a mile before needing to rest (Tr. 541)
- can stand for 15 minutes before needing to sit (Tr. 541)
- does not finish what he starts (chores, reading, watching movies) (Tr. 124)
- does not follow spoken instructions well (Tr. 124)
- does not handle stress (Tr. 125)
- does not handle changes in routine well (Tr. 125)
- walks on the treadmill (Tr. 517)
- is able to drive to the Outer Banks (Tr. 520)
- gardens (Tr. 520

## III.  The Motions for Summary Judgment

A.     <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant DBI is not supported by substantial evidence because the ALJ disregarded medical evidence from Claimant's treating physicians which supported Claimant's subjective symptoms when determining Claimant's credibility. Additionally, Claimant argues that the ALJ incorrectly found that Claimant had no severe mental impairments and failed to adequately account for all of Claimant's functional limitations in the Residual Functional Capacity assessment.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the ALJ properly evaluated Claimant's subjective complaints in determining Claimant's credibility, Claimant failed to prove he had a mental impairment under the listings, and the ALJ adequately accounted for all of Claimant's proven functional limitations in the RFC.

B.  Discussion

I.  Whether Substantial Evidence Supports a Finding that Claimant was not Entirely Credible.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ ignored objective medical evidence from Claimant's treating physicians that supported Claimant's subjective complaints. Additionally, Claimant alleges that the ALJ's reasons for discounting Claimant's symptoms are inadequate and not supported by substantial evidence. Commissioner contends that the ALJ correctly discredited Claimant's subjective complaints because substantial evidence supports the ALJ's finding that Claimant's subjective complaints concerning his functional limitations on and prior to the date last insured were not fully credible.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance."

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment." Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

SSR 96-7p sets forth certain factors for the adjudicator to consider when determining credibility. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily

activities, and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

In coming to his conclusion that Claimant was not entirely credible, the ALJ complied with the two-part test in Craig.  First, the ALJ found, in accordance with step one, that "claimant's medically determinable impairments present through his date last insured could have been reasonably expected to produce the alleged symptoms . . . ." (Tr. 17).  Second, in accordance with step two, the ALJ, finding that "the claimant's had [sic] his wife's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible," dedicated nearly seven pages of analysis explaining his reasoning for discrediting Claimant's testimony.  (Tr. 17).

In accordance with the factors set forth in SSR 96-7p, the ALJ examined the objective medical evidence, Claimant's daily activities, and Claimant's statements concerning the limiting effects of his symptoms and their inconsistencies with the record.

The ALJ primarily relies on the objective medical evidence. As a result of his work-related injury, Claimant suffered a facial contusion and blunt trauma of the left frontal teeth and alleged problems including vertigo, short-term memory loss, pain, numbness, and ringing in his ears, in addition to diabetes. The ALJ found that the objective medical evidence revealed that Claimant's injuries resulting from the accident, a maxillary alveolar fracture and nasal fracture, were repaired by Dr. Lattanzi following the accident. (Tr. 17). Claimant's ears, oral cavity, and nasopharynx were found normal and clear by Dr. Bland. (Tr. 17). Further, Dr. Brand diagnosed Claimant as having a non-displaced nasal bone tip fracture with no further treatment needed. (Tr. 17). Despite Claimant's complaints of recurrent and unpredictable dizziness, headaches, neck pain, and limited range of motion from his accident, Dr. Stearns found Claimant was stiff but only referred Claimant for physical therapy. (Tr. 17). Upon an independent medical examination, Dr. Lynch agreed with Dr. Stearns and recommended Claimant continue physical therapy because Claimant was not at a maximum degree of medical improvement. (Tr. 18). Based on the doctors' recommendations, Claimant continually participated in physical therapy, and at the end of his first round of physical therapy, his reports indicate that Claimant had "minimal pain with occasional sharp pain with sudden movement." (Tr. 18). Additionally, at the end of Claimant's second round of therapy, the reports indicate Claimant's "cervical range of motion was functional and was not limiting activities." (Tr. 18).

In light of Claimant's complaints of dizziness, Claimant had an MRI in May 2000. The MRI showed "essentially unremarkable intracranial findings with a very nonspecific focus of increased signal intensity." (Tr. 19). Additionally, Claimant's neurological examination revealed Claimant had no nystagmus, his fundoscopic exam was normal, and his visual files

were intact, but Claimant had not yet reached maximum medical improvement.  (Tr. 19).

Claimant also had a neuropsychological evaluation completed.  Claimant indicated a significant

improvement in his pain, reported some improvement with dizziness and memory, but

complained of concentration and short-memory problems.  (Tr. 19).  Dr. Haut noted that

Claimant did not appear to have posttraumatic stress disorder and had no problems with sensory

and/or motor examination except for mild relative problems with distal coordination.  (Tr. 19).

Upon examination by Dr. Martin, Dr. Martin reported that Claimant "had extremely low

test scores on all sensory organization tests, but functionally was reporting a much higher level.

He reported that the [C]laimant was also noted to have inconsistent gait and balance

performance."  (Tr. 19).  Dr. Martin reported Claimant had "significant ataxia in clinic but mild

to no ataxia outside on the sidewalk."  (Tr. 19).  Additionally, Claimant was referred to

vestibular rehabilitation by Dr. Martin, and after four weeks of treatment, Claimant showed no

improvement in dizziness; however, Claimant showed improvement in general strengthening,

flexibility, and endurance.  (Tr. 19-20).  Further, Dr. Martin reported that Claimant had no

nystagmus, and his ears were unremarkable upon examination.  Finally, Dr. Martin reported that

"there were notable discrepancies between the [C]laimant's functional status and his reports of

severity of his dizziness and some inconsistencies documented by the physiotherapist."  (Tr. 20).

Following an independent medical examination in September 2001, Dr. Doyle reported

that "it was clear that the [C]laimant did not have 'true vertigo.' . . . [and] that the [C]laimant had

mild to moderate mental status impairment and emotional impairments."  (Tr. 20).  In October

2002, Claimant had a psychological evaluation by Dr. Parsons.  Dr. Parsons indicated that "the

test results were not particularly consistent with the [C]laimant's presentation during interview,

in which he was able to recall numerous specific details about information, such as blood glucose levels at different times in the recent past." (Tr. 20). Claimant's test scores were much worse than the scores from two years earlier to which Dr. Parsons felt "might indicate poor effort on the memory tasks, exaggeration of memory difficulties, or a conversion disorder." (Tr. 20).

In June 2003, Claimant underwent a psychiatric independent medical evaluation. Dr. Clausell diagnosed Claimant with post concussive syndrome, residual state, mild and reported that Claimant's recent memory was fair and remote and past memory were fair to good. (Tr. 20). Overall, Dr. Clausell found Claimant's psychiatric impairment fell in the mild range and did not recommend psychiatric treatment. (Tr. 20-21). In October 2003, Claimant had a neuropsychological evaluation by Dr. Boone. Dr. Boone reported that "while the [C]laimant actually performed extremely well on many tests, his performance was severely impaired and suggestive of deliberate attempts to produce cognitive symptomatology on tests of memory and attention and concentration." (Tr. 21). Dr. Boone further reported that "there were a number of factors that called into question the validity of the tests results. . . . that the degree of memory pathology suggested by the [C]laimant's test performance was not consistent with his ability to report his symptoms during the clinic interview and his and his wife's reports that he was able to perform various chores around the house on a daily basis." (Tr. 21). Finally, a May 2004 report by Dr. Boone noted that Claimant "continued to present complaints of memory problems that did not fit the extent of his 'very mild brain injury.'" (Tr. 21). Dr. Boone indicated that Claimant "was very psychologically overwhelmed by the thought of returning to work." (Tr. 21).

Based on the objective medical evidence, the ALJ found that within less than 12 months of Claimant's work-related accident, Claimant "had regained the ability to perform the demands

of the range of sedentary work . . . ." (Tr. 21).

> The [C]laimant sustained a fracture of the upper jaw and complained of tooth pain after the accident and he also required the cervical spine surgery approximately six months after his accident. However, the record establishes that the claimant had a good result from the surgery for his maxillary alveolar and nasal fracture and from his neck surgery. He had some reduced range of motion of the neck but his neurological examinations after the surgery were normal. Within 12 months of his accident any residual neck, teeth or jaw pain were adequately accommodated by limiting the claimant to the performance of sedentary work.

(Tr. 21). Further, the ALJ found that Claimant "failed to establish a basis for any complaints of low back or right hip pain during the period in question." (Tr. 21). Additionally, the ALJ found that examinations following surgery failed to establish a basis for continued complaints of numbness in his upper extremities and that Claimant "exaggerated the extent of his headache pain and his vertigo and memory loss during the period in question." (Tr. 21). To support this finding, the ALJ relied on Claimant's MRI scan, which "showed no objective basis for the complaints of chronic headaches;" examinations, which "revealed that the [C]laimant has exaggerated the degree of his dizziness and memory loss and that he was only a mild post concussive syndrome." (Tr. 21).

Claimant also complained of diabetes mellitus. The ALJ found that Dr. Stearns reported in December 1999 that Claimant "had not been having too much trouble" with his diabetes lately and that "it had ben under fairly good control." (Tr. 22). In February 2000, Claimant reported he injured his shoulder due to a seizure during an insulin reaction; however, reports in June 2000 indicate that Claimant's shoulder injury was resolved and "his sugar was fairly easy to control during the day." (Tr. 22). Accordingly, the ALJ found that "[t]he overall record establishes that prior to his date last insured the [C]laimant's diabetes mellitus was adequately controlled and that it had no resulted in any end organ damage." (Tr. 22).

In addition to the objective medical evidence, the ALJ relied on Claimant and his wife's statements and Claimant's daily activities. The ALJ notes that "[o]n December 2, 1999, the [C]laimant reported to Dr. Stearns that he walked, played tennis, and lifted weights occasionally. . . . [and] that he slept very well at night." (Tr. 22). This, according to the ALJ, was "inconsistent with the degree of pain and functional limitations alleged by both the [C]laimant and his wife." (Tr. 22).

The ALJ correctly followed the two-step test in Craig. Additionally, the Court finds that the ALJ properly rejected Claimant's subjective complaints in light of the objective medical evidence. Therefore, more than substantial evidence exists to support the ALJ's decision to discredit Claimant's subjective complaints.

II.    Whether the ALJ Failed to Find Claimant had a Severe Mental Impairment.

Claimant argues that the ALJ committed plain error by finding that Claimant failed to establish any severe mental impairment prior to June 30, 2000. Specifically, Claimant argues that the ALJ failed to take into account the overwhelming medical evidence of Claimant's severe head injury on February 10, 1999, and the subsequent physical and mental consequences of post concussive syndrome and dizziness resulting from the trauma.

The Commissioner contends that Claimant failed to meet his burden of proving he had a mental impairment that significantly limited his ability to do basic work activities. Additionally, Commissioner contends that the ALJ accounted for any potential functional limitations caused by Claimant's alleged psychological problems.

"An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may

44

require." 42 U.S.C. § 423(d)(5)(A). The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3). At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities." Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. Claimants bear the burden of demonstrating they have a medically severe impairment. Bowen v. Yuckert, 482 U.S. 137, 146 (1987).

Claimant alleges the ALJ erred by failing to find that Claimant had a severe mental impairment prior to June 30, 2000. Mental impairments are evaluated according to the listings under 20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00. Listing 12.00 enumerates 10 different categories of mental impairments.[5] Id. To adequately establish a medically determinable impairment under Listing 12.00, there must exist "medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings)." Listing 12.00(B).

The Court cannot say that the ALJ erred by not finding Claimant suffered from a severe

---

[5] 12.01 category of impairments - mental; 12.02 organic mental disorders;12.03 schizophrenic, paranoid and other psychotic disorders; 12.04 affective disorders; 12.05 mental retardation; 12.06 anxiety related disorders; 12.07 somatoform disorders; 12.08 personality disorders; 12.09 substance addiction disorders; 12.10 autistic disorder and other pervasive developmental disorders

mental impairment on his date last insured. First, it was Claimant's burden to prove the existence of an impairment. Not only did Claimant not meet his burden of proving an impairment, but also Claimant failed to even allege he had an impairment under any of the 12.00 listings. Claimant's only statement with regard to this argument is simply "that the Claimant has failed to establish any severe mental impairment prior to June 30, 2000, is plain error and does not take into account the overwhelming medical evidence of the Claimant's severe head injury on February 10, 1999, and the subsequent physical and mental consequences of post concussive syndrome and dizziness proximately resulting from the trauma." (Pl. Br. P. 5). Claimant fails to identify under which listing Claimant's mental impairment falls. Therefore, it is impossible to predict how Claimant would use the medical evidence to carry his burden in proving he suffered from a severe mental impairment. Additionally, even if Claimant were to have specifically identified a listing, the Court is somewhat pessimistic about Claimant's likelihood of success. Listing 12.00(B) specifies that there must exist "medical evidence consisting of symptoms, signs, and laboratory findings (including psychological test findings)" in order to adequately establish a medically determinable impairment under 12.00. However, a Psychiatric Review Technique by Dr. Allen on April 5, 2006, and a Psychiatric Review Technique by Dr. Hursey on August 2, 2006, both indicate that are no medical records evidencing his head injury. (Tr. 186-99; 200-13).

Accordingly, the ALJ did not err by not finding Claimant suffered from a severe mental impairment on his date last insured.

III.  Whether the ALJ's RFC Assessment Adequately Accounted for All of Claimant's Proven Functional Limitations.

Claimant contends that the RFC did not adequately account for all of Claimant's proven functional limitations. Specifically, Claimant argues that the RFC did not include non-exertional

limitations, which prevent him from engaging fully in sedentary work and the narrow range of work available. These non-exertional limitations include Claimant's neck pain, dizziness, dramatic and significant deficits in all areas of memory functioning and his daily chronic symptoms of pain, postural limitations, headaches, vertigo, tinnitus, and the effect of their frequency, intensity, and duration. Commissioner contends that the ALJ's RFC assessment generously accounted for all of Plaintiff's proven functional limitations as well as many of his unsubstantiated subjective complaints.

A Residual Functional Capacity is what a claimant can still do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. Id. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. Id. This assessment is not a decision on whether a Claimant is disabled but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. Id.

The ALJ is responsible for determining a claimant's RFC. Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004). The RFC determination must be based on medical evidence. Id. "An ALJ's determination of a claimant's RFC must find support in the medical evidence." Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004). "Subjective complaints of pain are often central to a determination of a claimant's RFC;" however, "[t]he ALJ may discount

subjective complaints 'if there are inconsistences in the evidence as a whole.'" Id. (quoting Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001).  Courts reviewing an ALJ's RFC assessment must determine whether the record presents medical evidence of the claimant's RFC at the time of the hearing.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).

The Court cannot say that the RFC did not adequately account for all of Claimant's non-exertional impairments.  The ALJ determined that Claimant has an RFC "to perform a range of sedentary work with certain modifications.  He could not be exposed to unprotected heights or dangerous, moving machinery.  He was limited to the performance of simple, routine, one-to three-step tasks."  (Tr. 16).  In determining Claimant's RFC, the ALJ considered the objective medical evidence, none of which supports Claimant's contention that he has non-exertional limitations including neck pain, dizziness, dramatic and significant deficits in memory, pain, postural limitations, headaches, vertigo, or tinnitus.  As explained above, the ALJ evaluated the objective medical evidence and found "that within less than 12 months of [Claimant's work-related] accident the claimant had regained the ability to perform the demands of the range of sedentary work . . . ."  (Tr. 21).

> The [C]laimant sustained a fracture of the upper jaw and complained of tooth pain after the accident and he also required the cervical spine surgery approximately six months after his accident.  However, the record establishes that the [C]laimant had a good result from the surgery for his maxillary alveolar and nasal fracture and from his neck surgery.  He had some reduced range of motion of the neck but his neurological examinations after the surgery were normal.  Within 12 months of his accident any residual neck, teeth or jaw pain were adequately accommodated by limiting the [C]laimant to the performance of sedentary work. The undersigned finds that the [C]laimant has failed to establish a basis for any complaints of low back or right hip pain during the period in question.  Further, the examinations following the [C]laimant's surgery fail to establish any continued complaints of numbness in the upper extremities prior to the date last insured.

(Tr. 21).

Additionally, the ALJ discounted Claimant's complaints of headaches, vertigo, and memory loss because Claimant's "MRI showed no objective basis for the complaints of chronic headaches. The examinations have also revealed that the [C]laimant has exaggerated the degree of his dizziness and memory loss and that he has only a mild post concussive syndrome." (Tr. 21). The ALJ concluded noting he accommodated Claimant's head injury-related symptoms by limiting Claimant "to the performance of simple, routine one- to three-step tasks." (Tr. 21). Further, the ALJ found that Claimant "failed to establish a basis for any ongoing complaints" of numbness in the upper extremities or back or right hip pain during the period in question. (Tr. 22). Finally, the ALJ concluded that "based on the above-detailed evaluations the record establishes that he has exaggerated the degree of his headaches, vertigo, and memory loss." (Tr. 22).

The ALJ had no duty to account for nonexertional limitations unsupported by objective medical evidence, and Claimant provides no authority requiring the ALJ to do so. Therefore, the ALJ did not err in assessing Claimant's RFC.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because 1) substantial evidence supports the ALJ's finding that Claimant was not entirely credible, 2) the ALJ did not err by concluding that Claimant did not suffer from a severe mental impairment prior to the date last insured, and 3) the ALJ adequately accounted for all of Claimant's limitations in the RFC.

      2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: January 12, 2010

                    /s/ *James E. Seibert*
                    JAMES E. SEIBERT
                    UNITED STATES MAGISTRATE JUDGE